## OB–GYN ASSOCIATES OF NORTHERN INDIANA, P.C., Appellant–Defendant,

v.

## Tammy RANSBOTTOM, Appellee–Plaintiff.

No. 71A03–0711–CV–503.

Court of Appeals of Indiana.

May 8, 2008.

Edward A. Chapleau, South Bend, IN, Attorney for Appellant.

Vincent M. Campiti, Nemeth Feeney & Masters, P.C., South Bend, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Upon interlocutory appeal, Ob–Gyn Associates of Northern Indiana, P.C. (Ob–Gyn) appeals the denial of its motion to dismiss a negligence action against it filed by Tammy Ransbottom. The propriety of that ruling hinges upon the answer to the following question: Is cosmetic laser hair removal "health care" within the meaning of Indiana's Medical Malpractice Act?

We affirm.

The facts are brief and undisputed. On January 23, 2006, Ransbottom went to Ob–Gyn's office in Mishawaka and underwent laser hair removal treatment. Treatment was administered with a Coherent LightSheer diode laser machine (the laser machine) by Roxanne Roschek, an R.N. employed by Ob–Gyn. Treatment consisted of a cutting laser that was just powerful enough to reach the dermis layer of the skin to affect the hair follicles. Roschek was trained on the laser machine by Kim Weber, her supervisor at Ob–Gyn. Roschek received her training over a three- or four-month period in 2004. Roscheck received no certification or license upon completion of her training, and no license, degree, or certification was required to operate the laser machine. In fact, it is common in the cosmetic industry for beauty salon employees who are not healthcare workers to operate laser equipment for hair removal purposes. Ransbottom sought hair removal treatment strictly for

cosmetic purposes; there was no medical reason for undergoing the treatment. Ransbottom alleges that as a result of her treatment that day, she was burned.

Ransbottom filed a complaint against Ob–Gyn alleging negligence. Ob–Gyn responded with a Motion to Dismiss Plaintiff's Complaint or in the Alternative, Motion For Summary Judgment (the Motion to Dismiss). In the Motion to Dismiss, Ob–Gyn argued that the laser treatment constituted "health care" within the meaning of Indiana's Medical Malpractice Act. The trial court denied the motion. Ob–Gyn filed a motion requesting certification of the order denying its motion to dismiss. The trial court granted the motion and certified its ruling. Ob–Gyn filed a Petition for Acceptance of Interlocutory Appeal with this court, and on November 27, 2007, this court granted the motion and accepted jurisdiction of this interlocutory appeal.

Although the rule was not specifically cited, Ob–Gyn's motion to dismiss was premised upon a claim of lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1). Ob–Gyn asserted then and asserts on appeal that the trial court lacked subject matter jurisdiction over the case because Ransbottom's complaint was not submitted to a medical review panel for review of the complaint and rendition of an opinion, as required by the Medical Malpractice Act under Ind.Code Ann. § 34–18–8–4 (West, PREMISE through 2007 1st Regular Sess.). Ransbottom responded below and reiterates on appeal that the Medical Malpractice Act is inapplicable to her claims because the laser treatment she received did not constitute "health care" within the meaning of I.C. § 34–18–2–18 (West, PREMISE through 2007 1st Regular Sess.) and thus her claims sound in ordinary negligence rather than negligent provision of healthcare services. The trial court agreed with that claim.

■ Our standard of review for the grant or denial of a motion to dismiss pursuant to T.R. 12(B)(6) is a function of what occurred in the trial court. *GKN Co. v. Magness*, 744 N.E.2d 397 (Ind.2001). If, as here, the facts are not in dispute, then the question of subject matter jurisdiction is purely one of law and no deference is afforded to the trial court's conclusion. *Bedle v. Kowars*, 796 N.E.2d 300 (Ind.Ct. App.2003). Moreover, we are required in the instant case to interpret the Medical Malpractice Act. The interpretation of a statute is a question of law. *Indiana Patient's Comp. Fund v. Winkle*, 863 N.E.2d 1 (Ind.Ct.App.2007), *trans. denied*. Thus, the standard of review is de novo. *Id.*

■ The question before us is whether the laser hair removal treatment Ransbottom received at Ob–Gyn was "health care" within the meaning of the Medical Malpractice Act. In pressing their respective arguments, the parties have regrettably little in the way of precedent upon which to rely. There are virtually no Indiana cases on the general subject of what constitutes health care within the meaning of the Medical Malpractice Act. Ob–Gyn cites four: (1) in *Murphy v. Mortell*, 684 N.E.2d 1185 (Ind.Ct.App.1997), *trans. denied*, this court held that an allegation of sexual battery upon a hospital patient against a critical care respiratory therapy technician did not fall within the Medical Malpractice Act; (2) in *Smith v. Hull*, 659 N.E.2d 185 (Ind.Ct.App.1995), *trans. denied*, we concluded there was no error in instructing the jury in a medical malpractice lawsuit alleging medical negligence in injecting prosthetic human hair into the scalp of a man with male pattern baldness; (3) in *Battema v. Booth*, 853 N.E.2d 1014 (Ind. Ct.App.2006), *trans. denied*, we focused on the doctrine of fraudulent concealment in a

medical malpractice action based upon a claim that the defendant healthcare provider failed to inform a patient that a physician to whom the patient was referred for a pulse laser procedure to remove a birthmark was, at the time of the (botched, as it turned out) treatment, a narcotics addict; and (4) *Ogle v. St. John's Hickey Mem'l Hosp.*, 473 N.E.2d 1055, 1059 (Ind.Ct.App.1985), *trans. denied,* in which a patient at a hospital psychiatric unit sued the hospital for negligence after she was raped by another patient and we affirmed summary judgment against the plaintiff upon our conclusion that proper confinement constitutes "part and parcel of the diagnosis and treatment of her condition", and therefore that the allegedly negligent act constituted health care.

In response, Ransbottom cites primarily one out-of-state case: *Witherspoon v. Teton Laser Center, LLC,* 149 P.3d 715 (Wyo. 2007). In that case, a woman sued a physician alleging that she suffered burns and scarring as a result of his negligent administration of intense pulsed light (IPL) hair-removal treatment. Although the main legal issue addressed in the opinion concerned the denial of an offer to prove, Ransbottom focuses on a different aspect of the case, i.e., the Wyoming Supreme Court's statement that "[t]his . . . is not a medical malpractice action." *Id.* at 727. This conclusion was not the product of legal analysis, but instead restated a decision the trial court had made—a decision that was not challenged upon appeal. The trial court's decision, in turn, was made upon the following rationale:

> Any person conducting the IPL hair removal procedure is not practicing medicine according to the definition of "Practicing Medicine", in W.S. § 33–26–102(a)(xi). The Wyoming State Board of Medicine determines what constitutes the practice of medicine. The Board has the duty to pass upon the qualifications

and determine the fitness of all persons desiring to practice medicine in this state. W.S. § 33–26–202(a). The Board does not allow a person to practice medicine in this state without a license granted by the Board. W.S. § 33–26–301(a). Since a person may perform IPL hair removal without a license, it is clearly not the practice of medicine as the above statute would be violated. In addition, Defendants have provided no evidence that the Board has elected to treat IPL or Laser hair removal as the practice of medicine. It is noted that physician supervision is required by the manufacturers of hair removal equipment. However, the process of hair removal, in itself, does not require a medical degree, license or certification and cannot be considered the practice of medicine.

*Id.* at 727. Thus, although the Wyoming trial court addressed precisely the issue under consideration in this case, the Wyoming Supreme Court did not. Still, the trial court's decision represents one example of a court adopting at least a portion of the argument made by Ransbottom and accepted by the trial court in the instant case.

With this authority in mind, we proceed with our analysis of whether Ransbottom's laser hair removal treatment constituted health care within the meaning of the Medical Malpractice Act. We first must observe that the foregoing cases have little to offer with respect to guideposts for our analysis. In *Murphy* and *Smith,* there was no dispute about whether the respective treatments in those cases constituted health care. Although the former case involved cosmetic hair care and the latter involved the pulse laser treatment modality, there were differences between those facts and these that are significant for our purposes. Moreover, and perhaps most importantly, the question of whether the

alleged tort constituted medical malpractice was not a contested issue, but rather was conceded by both parties for purposes of appeal. The same is true of *Battema*. In light of this, to cite those cases as authority for the proposition that pulse laser treatment for cosmetic hair removal constitutes health care is to beg the question.

The fourth case cited by Ob–Gyn, *Ogle*, is only slightly more relevant, in that it is an example of the fact that medical malpractice can stem from the acts of someone other than a physician. That principle is hardly controversial, *see, e.g., Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1200 (Ind. 2008) ("a surgeon may not escape his responsibility to remove sponges used during the surgery simply by delegating responsibility for tracking surgical sponges to attending nurses"), and certainly not determinative here. Likewise, *Witherspoon* is of limited value, not only because it emanates from another jurisdiction, but also because it assumes the principle we undertake to decide, and thus there is no appellate analysis. It appears, then, that we start with a blank slate.

Leaving aside the foregoing tepid legal authority, Ob–Gyn's argument is that pulse laser treatment in the instant case constitutes health care because it (1) was performed by a registered nurse who worked for a health-care provider (Ob–Gyn), (2) utilized equipment that required training and, therefore, the exercise of skill and expertise on the part of the operator, and (3) involved "medicinal implications and complications that may arise in the use of the laser such as burning and scarring of the patient's body." *Appellant's Brief* at 5. In other words, it was health care because it was administered by a nurse, used technology that required training and skill, and could have resulted in injury if not administered properly.

We have observed before that the Medical Malpractice Act "pertains to curative or salutary conduct of a health care provider acting within his or her professional capacity[.]" *Murphy v. Mortell*, 684 N.E.2d at 1188. "Professional capacity" in this context no doubt alludes to the function of physicians and nurses as licensed health care professionals who are skilled in promoting and maintaining health. Moreover, the Medical Malpractice Act is designed to exclude that conduct which is not related to " 'the promotion of a patient's health or the provider's exercise of *professional* expertise, skill, or judgment.' " *Id.* (quoting *Collins v. Thakkar*, 552 N.E.2d 507, 510 (Ind.Ct.App.1990), *trans. denied* ) (emphasis supplied). Although we certainly can envision scenarios in which a nurse's operation of equipment in a medical facility would constitute health care, we are not called upon to decide this question in a vacuum. We must consider all of the relevant facts in this case in making our determination because "we are guided by the substance of the claim to determine the applicability of the [Medical Malpractice Act]." *Id.* What are the relevant facts?

We start with the site of the alleged negligent conduct and the nature of the party defendants. The complaint alleges negligence on the part of Roschek, a registered nurse, and alleges that the conduct occurred in Ob–Gyn's medical facilities. We have observed, "the fact that conduct occurs in a health care facility cannot, by itself, transmute the conduct into the rendition of health care or professional services." *Id.* Although the location of the occurrence is indeed one factor to consider in deciding whether it falls within the purview of the Medical Malpractice Act, it is not determinative. There must be more; there must be a causal connec-

tion between the conduct and the nature of the patient and healthcare provider relationship. *Murphy v. Mortell,* 684 N.E.2d 1185.

In this regard, Ransbottom claims the laser treatment did not constitute health care because it was entirely cosmetic. Although this might have marginal significance in our analysis, of far greater significance is the fact that Ransbottom's laser hair removal treatment was not recommended or supervised by a physician, nor in any other way conducted under a physician's auspices. We can extend this line of reasoning even further and observe that although Roschek operated the laser machine while employed as a nurse at Ob–Gyn's facility, her credentials as a registered nurse were not necessary to perform that task. We note in this regard it is undisputed that the operator of the laser machine was not required to possess an R.N. degree or any other form of medical training or licensure. To be sure, one must be trained to operate the laser machine and Roschek received that training. By itself, however, the necessity of operator training does not render use of this piece of equipment—or any equipment, for that matter—health care. This is not changed by the fact that the person who received the training happened to be, as in this case, a registered nurse. It appears from the record that there simply are no requirements for operators with respect to medical qualifications, training, or licensure.

We turn now to the claim that the laser treatment constituted health care because misuse of the machine could cause injury. We do not mean to be flip in observing that the same could be said of *many* pieces of machinery, including chainsaws, tanning beds, and motor vehicles, to cite just a few examples. Perhaps this factor has more significance in our analysis because this piece of machinery, i.e., the laser machine, is intended to operate *on* the human body. That fact counsels in favor of Ob–Gyn's position, but again is not determinative. We note for instance that tattoo equipment and the aforementioned tanning beds also are intended to work on the human body, but no one would argue that tanning or tattooing constitute health care. In the end, the fact that the laser machine is a piece of equipment intended to work on the human body and its misuse could cause injury does not, in and of itself, settle the question. Again, these do not weigh as heavily as what we deem to be the more significant considerations, i.e., the fact that physicians were not involved in Ransbottom's treatment, and the operator of the laser machine was not required to be a healthcare worker or possess healthcare credentials such as medical degrees, medical licensure, or medical certification in order to operate the machine.

Finally, we recall Ransbottom's uncontradicted assertion that this treatment can be, and often is, legally administered in beauty salons by beauty salon employees. With this in mind, it appears that, but for the fact that the laser machine's operator happened to be a registered nurse and the laser machine happened to be located in a medical facility, there would be no question but that Ransbottom's laser hair removal treatment did not constitute health care. Again, so far as we can tell, Ransbottom could have legally obtained the same treatment somewhere other than a healthcare facility, and could have legally done so without the assistance or participation of someone with valid healthcare licensing or certification credentials. In those respects, the laser hair removal treatment is analogous to tattooing or tanning, both of which alter the body for cosmetic purposes, but neither of which need be performed by a licensed or certified physician or healthcare professional.

In the final analysis, the strongest factors in favor of Ob–Gyn's claims on appeal are that Ob–Gyn is a medical facility and the laser machine was operated by one of its nurses on its premises. In this case, that is not enough. "The Act is not all-inclusive as to claims against medical providers, and a claim against a medical provider sounding in general negligence ... rather than medical malpractice is outside the Act." *Peters v. Cummins Mental Health, Inc.*, 790 N.E.2d 572, 576 (Ind.Ct. App.2003), *trans. denied.* What is it that distinguishes claims against medical providers as sounding in standard negligence or medical malpractice? In this case, it is the fact that laser hair removal treatment may be administered without the involvement of medical doctors. As we have already observed several times, no physician participated in Ransbottom's laser hair removal treatment. Moreover, and significantly, no healthcare professional was *required* to. A doctor-patient relationship is a prerequisite to maintaining a malpractice action. *Kuester v. Inman*, 758 N.E.2d 96 (Ind.Ct.App.2001). As a general rule, where a doctor does not in any way participate in the plaintiffs care or treatment, a doctor-patient relationship will not be found to exist. *See Miller v. Martig*, 754 N.E.2d 41 (Ind.Ct.App.2001). The general rule applies here and defeats Ob–Gyn's argument.

In summary, we conclude that the laser hair removal treatment administered by Roschek did not constitute health care with the meaning of the Medical Malpractice Act, and the trial court did not err in denying Ob–Gyn's motion to dismiss.

Ruling affirmed.

MATHIAS, J., and ROBB, J., concur.