

NUMBER 13-08-00091-CV

# COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**LEONARD TESORO, M.D.,**                                                                      **Appellant,**

**v.**

**EMMA ALVAREZ,**                                                                      **Appellee.**

### On appeal from the County Court at Law No. 1
### of Hidalgo County, Texas.

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Opinion by Justice Rodriguez**

This is an interlocutory appeal from the trial court's denial of appellant Leonard

Tesoro, M.D.'s motion to dismiss appellee Emma Alvarez's claims on the basis that she

failed to comply with Texas Civil Practice and Remedies Code section 74.351. TEX. CIV.

PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2008) (requiring that an expert report

must be filed timely in health care liability claim); *see id.* § 51.014(a)(9) (Vernon 2008) (providing for an interlocutory appeal from an order denying relief sought by a motion under section 74.351(b)). By four issues, Dr. Tesoro argues that Alvarez's claims against him are health care liability claims and that, because Alvarez failed to provide an expert report, the trial court erred in failing to dismiss her claim with prejudice. Because we conclude that the nature of Alvarez's claim is not health care liability, we affirm.

## I. BACKGROUND

In 2006, Dean Joshua Blount, R.N.,[1] a family nurse practitioner at the Texas Southwest Medical Aesthetic Clinique (TSMAC), removed hair from Alvarez's legs using a MeDioStar HC laser.[2] The laser allegedly burned Alvarez's legs and left scars. Alvarez sued Blount for negligence claiming that Blount improperly used the laser. In her third amended petition, Alvarez added Dr. Tesoro as a defendant and alleged that, as a general partner of TSMAC, Dr. Tesoro was vicariously liable for the negligence of Blount, his agent. Alvarez did not file an expert report within 120 days of filing the claim and did not request an extension to file a report.

Dr. Tesoro moved to dismiss Alvarez's suit on the basis that her claim was a health care liability claim and therefore subject to the requirements of chapter 74 of the civil practice and remedies code, and that Alvarez had failed to file an expert report. Anticipating that Alvarez would contend that her cause of action was not a health care liability claim, Dr. Tesoro urged that because he is a physician and because the

---

[1]Dean Joshua Blount, R.N., is not a party to this appeal.

[2]This device is also referred to, in the record, as an 810 Diode Laser.

2

complained-of conduct is "health care," Alvarez's allegations constitute a health care liability clam. In her response to Dr. Tesoro's motion, Alvarez set out that she went to TSMAC to have unwanted hair on her legs removed with a laser; that Blount was the person who used the laser to remove the hair; and that Dr. Tesoro had no personal involvement in the use of a laser to remove her leg hair. Alvarez asserted, in her response, that laser hair removal does not constitute health care, practicing medicine, or medical care, and therefore her claim is not a health care liability claim that requires an expert report.

Following a hearing on Dr. Tesoro's motion to dismiss, the trial court denied the motion. This interlocutory appeal ensued.

## II. STANDARD OF REVIEW

Generally, we review a trial court's denial of a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Cnts. of Tex., Inc. v. Palacios*, 46 S.W.3d 874, 877 (Tex. 2001); *Valley Baptist Med. Ctr. v. Stradley*, 210 S.W.3d 770, 773 (Tex. App.–Corpus Christi 2006, pet. denied). However, we review de novo the trial court's denial of a motion to dismiss when it involves the determination of whether a claim is a health care liability claim under chapter 74. *Lee v. Booth*, 235 S.W.3d 448, 451 (Tex. App.–Dallas 2007, pet. denied); *Stradley*, 210 S.W.3d at 773; *Gomez v. Matey*, 55 S.W.3d 732, 735 & n.2 (Tex. App.–Corpus Christi 2001, no pet.).

## III. APPLICABLE LAW

Under section 74.351 of the Texas Civil Practice and Remedies Code, any person who has brought a suit asserting a health care liability claim must, within 120 days of filing

3

the claim, provide an expert report for each physician or health care provider against whom the claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). If the claimant does not provide an expert report as required, the trial court must, upon motion by the defendant, dismiss the claim with prejudice. *Id.* § 74.351(b). Expert report requirements of section 74.351(b) apply to a claim, regardless of whether it is a tort claim, when that claim comes within the statutory three-part definition of a "health care liability claim." *Id.*

> Chapter 74 defines a "health care liability claim" as,
>
> a cause of action [1] against a health care provider or physician [2] for treatment, lack of treatment or other claimed departure from an accepted standard of medical care, or health care, or safety or professional administrative services directly related to health care, [3] which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13) (Vernon 2005) (numbering added). Chapter 74 also defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10) (Vernon 2005).

In applying the above definitions to a pleading, we examine the claim's underlying nature. *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 242-43 (Tex. 1994); *see Victoria Gardens of Frisco v. Walrath*, 257 S.W.3d 284, 287 (Tex. App.–Dallas 2008, pet. denied); *see Valley Baptist Med. Ctr. v. Azua*, 198 S.W.3d 810, 814 (Tex. App.–Corpus Christi 2006, no pet.). If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services then the claim is a health care liability claim. *See Diversicare Gen. Partners, Inc.*

4

*v. Rubio*, 185 S.W.3d 842, 849 (Tex. 2005); *Rose*, 156 S.W.3d at 544 (citing *Walden v. Jeffery*, 907 S.W.2d 446, 448 (Tex. 1995) (per curiam)).

We focus on the nature and essence of the claim and are not bound by the form of the pleading. *Diversicare*, 185 S.W.3d at 847, 851; *see Sorokolit*, 889 S.W.2d at 242; *Parker v. CCS/Meadow Pines, Inc.*, 166 S.W.3d 509, 512 (Tex. App.–Texarkana 2005, no pet.). "Plaintiffs cannot use artful pleading to avoid the . . . [Chapter 74] requirements when the essence of the suit is a health care liability claim." *Pallares v. Magic Valley Electric Coop., Inc.,* 267 S.W.3d 67, 71 (Tex. App.–Corpus Christi 2008, pet. denied) (quoting *Rose*, 156 S.W.3d at 543). "However, courts must be equally careful not to extend chapter 74's reach beyond its stated bounds." *Id.* "Not every action taken by a health care provider or every injury sustained by a patient is a health care liability claim." *Id.*

## IV. NATURE OF ALVAREZ'S CLAIM

It is undisputed that Dr. Tesoro is a physician and that Alvarez filed a claim against him; thus, the first element necessary to establish a health care liability claim—that the claim be against a physician—has been satisfied. *See* TEX. CIV. PRAC. & REM. CODE ANN.§ 74.001(a)(13); *see also id.* § 74.001(a)(23) (Vernon 2005) (defining "physician" as "an individual licensed to practice medicine in this state"). Accordingly, we sustain Dr. Tesoro's second issue that presents this argument. In addition, the third element—that the alleged improper use of the laser proximately caused Alvarez's injury—is not at issue in this appeal. *See id.* § 74.001(a)(13). Therefore, in determining the nature of Alvarez's claim,

5

we address only the second element—the "for treatment" element—of a health care liability claim. *See id.*

In his first and third issues, Dr. Tesoro contends that this second element has been satisfied because "health care" forms the basis of Alvarez's allegations. *See id.* In support of his argument, Dr. Tesoro asserts that, in this case, laser hair removal constitutes "health care" because Alvarez referred to it as "treatment" in her petition, the hair was removed in a medical clinic, records were generated, and the procedure was performed with a regulated medical device.

## A. Use of "Treatment" in Petition

Relying on *Sarwal v. Hill*, a memorandum opinion from the Houston First Court of Appeals, Dr. Tesoro asserts that we should conclude that Alvarez's claim constitutes "health care" because Alvarez referred to the complained-of act as "treatment" when she stated in her petition that "Blount performed laser hair removal treatment." *See* No. 14-01-01112-CV, 2002 Tex. App. LEXIS 8783, at *8-*9 (Tex. App.–Houston [14th Dist.] Dec. 12, 2002, no pet.) (mem. op.). However, the *Sarwal* court concluded that the cause of action asserted in Sarwal's petition was framed only as a health care liability claim not only because the petition consistently referred to the laser hair removal as "treatment" or "therapy," but because the petition also stated that Sarwal had complied with the requirements of 4590i, the medical liability act in effect at that time, and had affirmatively stated that Hill's allegedly deficient actions and omissions were all breaches of the nursing standard of care. *Id*.

6

The present case is distinguishable from *Sarwal*. Using the word "treatment" only once in her petition, Alvarez described the alleged negligent act as follows: "[i]n or around May of 2006, Blount performed laser hair removal treatment upon [her] legs, so as to severely to burn and scar [her] legs." Her allegations assert improper use of the laser. Alvarez does not assert that Dr. Tesoro deviated from an accepted standard of medical care or that Blount's actions breached the nursing standard of care. And, Alvarez does not claim that she complied with the medical liability statute, as did the appellant in *Sarwal*. *See id.* Rather, Alvarez framed her claims only as common law negligence claims—that Blount was negligent when he used the laser improperly and that Dr. Tesoro was vicariously liable for Blount's actions.

In addition, "health care" is "any act . . . performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient *during the patient's medical care, treatment, or confinement*." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (emphasis added). Dr. Tesoro does not argue, and the record does not support, that the basis of Alvarez's claim is "health care" because the complained-of act occurred during her confinement or during her medical care, the general definition of which is "practicing medicine." *See id.* § 74.001(a)(19) (defining medical care); *see also* TEX. OCC. CODE ANN. § 151.002(a)(13) (Vernon Supp. 2008) (defining "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury"). Dr. Tesoro appears to contend only that the complained-of act occurred during Alvarez's treatment, and because Alvarez used the word "treatment" in her petition, it must be for "health care."

7

Even though "treatment" is used in the definition of "health care" and in the definitions of "health care liability claim," "medical care," and "practicing medicine," the legislature chose not to define "treatment." Dr. Tesoro directs us to no case law, and we find none, that considers how "treatment" is defined within the context of laser hair removal at common law. *Cf. Powers v. Floyd,* 904 S.W.2d 713, 717 (Tex. App.–Waco 1995, writ. denied) (defining "treatment" broadly as "to care for or deal with medically or surgically" in a parental consent case under section 12.04(6) of the family code); *Skloss v. Perez*, No. 01-08-00484-CV, 2009 Tex. App. LEXIS 89, *15, *20-*23 (Tex. App.–Houston [1st Dist.] Jan. 8, 2009, no pet. h.) (mem. op.) (concluding that a licensed professional counselor was a health care provider providing health care treatment when she assessed, evaluated, and treated appellees' mental health disorders). Therefore, we look to the plain meaning of "treatment" to determine its application in this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(b) (Vernon 2005) ("Any legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law."); *Kendrick v. Garcia*, 171 S.W.3d 698, 704 (Tex. App.–Eastland 2005, pet. denied) ("[Section 74.001(b)] essentially restates the rule of statutory construction that terms in a statute are to be given their plain meaning.").

The term "treatment" is defined in common usage as "the act or manner or an instance of treating someone or something" and as "the techniques or actions customarily applied in a specific situation." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1333 (11th ed. 2003). Within the medical context, "treatment" is defined as "the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." MOSBY'S MEDICAL DICTIONARY 1880 (8th ed. 2009). Also, the Medline Plus online dictionary

8

defines "treatment" in the medical context as "the action or manner of treating a patient medically or surgically" and "treat" as "to care for or deal with medically or surgically: deal with by medical or surgical means." MEDLINE PLUS, www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "Enter search term" for "treatment" or "treat").

Based on the definition of "treatment" in the medical context, the record does not support a determination that Alvarez's care was "to combat, ameliorate, or prevent a disease, disorder, or injury," *see* MOSBY'S MEDICAL DICTIONARY at 1880, or that she was treated, cared for, or dealt with medically or surgically. *See* MEDLINE PLUS, www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "Enter search term" for "treatment" or "treat"). However, applying the definition in common usage or plain meaning of the word, Alvarez's use of "treatment" could have referred to "techniques or actions customarily applied in a specific situation" which, in this case, would have been a reference to techniques or actions customarily applied in the use of a laser during hair removal. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 1333. Thus, we cannot conclude that labeling laser hair removal as "treatment" in her petition supports a determination that the underlying nature of Alvarez's claim is "health care."

## B.  Context of Treatment

Dr. Tesoro also contends that "health care" forms the basis of Alvarez's allegations because of the context in which her laser hair removal occurred.  While we agree that the context in which a procedure occurs may include factors to be considered, we  disagree that the identified factors are determinative in this case.

9

## 1. Documentation

Dr. Tesoro first asserts that "health care" forms the basis of Alvarez's allegations because, prior to the laser hair removal procedure, Alvarez's medical history was taken. He comments that, unlike getting a haircut or manicure, records, including an informed consent, a medical history, and progress notes, are generated throughout the hair removal procedure, and because such forms are routinely generated, Alvarez's allegations are based on "health care." However, Dr. Tesoro also acknowledges that he is uncertain as to whether these documents were generated for Alvarez because she may have used an alias and because TSMAC has closed since the events at issue and the records, if any, may no longer exist. In addition, although Dr. Tesoro stated in his affidavit attached to his motion to dismiss that Blount took Alvarez's medical history before he performed the laser hair removal, a completed medical history form for Alvarez does not appear in the record.[3] Therefore, this argument is without support.

## 2. Location

Dr. Tesoro also argues that the basis of Alvarez's allegations is "health care" because the procedure was performed at a medical clinic. It is undisputed that the procedure was performed at TSMAC, and Alvarez does not dispute that it is a medical clinic as Dr. Tesoro describes. Nonetheless, the fact that conduct occurs in a medical clinic cannot, by itself, transform the conduct into "health care." As courts have

---

[3]Copies of a standard medical history form and a standard consent form used by the Texas SouthWest Medical Aesthetics Clinique are included in the appendix of Dr. Tesoro's brief. Dr. Tesoro claims that these documents were produced in response to written discovery requests. Also included in the appendix is a progress note form for Hilda Martinez, the alleged alias used by Alvarez. The progress note documents one visit on June 21, 2006. These documents do not, however, appear in the clerk's record filed in this appeal. Accordingly, we can not consider them. *See Gonzalez v. Villarreal*, 251 S.W.3d 763, 777 n.17 (Tex. App.–Corpus Christi 2007, pet. dism'd w.o.j.).

acknowledged in safety-claims cases, "[t]here may be circumstances that give rise to premises liability claims in a healthcare setting that may not be properly classified as health care liability claims." *Harris Methodist Fort Worth v. Ollie*, 270 S.W.3d 720, 724 (Tex. App.–Fort Worth 2008, no pet.) (quoting *Diversicare*, 185 S.W.3d at 854). Likewise, there may be circumstances that give rise to general negligence claims in a healthcare setting that may not be properly classified as a health care liability claims.

In this case, although the complained-of act occurred at a medical facility, Alvarez expressed in her response to Dr. Tesoro's motion to dismiss that she went to the medical clinic because she desired to have unwanted hair removed from her legs. She explained that Blount removed the hair and that Dr. Tesoro had "no personal involvement in the subject use of a laser to remove [her] leg hair." Alvarez does not claim that her laser hair removal was prescribed, recommended, supervised, or in any other way conducted by Dr. Tesoro at the medical clinic, and Dr. Tesoro provides no support of his involvement in the procedure, by order or otherwise.

## C. Regulated Medical Device

Finally, Dr. Tesoro contends that because the act of alleged negligence involved a regulated medical device, "health care" forms the basis of the allegations. Without explanation, Dr. Tesoro identifies regulations and documentation relevant to the MeDioStar HC laser, but offers no authority, and we find none, that supports his general contention.

Nonetheless, it is undisputed that the MeDioStar HC laser is a Class II prescription medical device and is registered with, and regulated by, the U.S. Food and Drug

11

Administration (FDA).[4]  *See* 21 C.F.R. § 801.109 (2008) (defining prescription devices); *id.* § 878.4810 (identifying lasers as Class II devices);[5] Federal Food, Drug, and Cosmetic Act (FFDCA) § 201(h), 21 U.S.C.A. § 321(h) (1999) (defining "medical device").  A prescription device is described as follows:

> A device which, because of any potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use is not safe except under the supervision of a practitioner licensed by law to direct the use of such device, and hence for which "adequate directions for use" cannot be prepared . . . .

21 C.F.R. § 801.109.  It is "a device that cannot have adequate directions for lay use." *Rayford v. State*, 16 S.W.3d 203, 209 (Tex. App.–Dallas 2000, pet. denied) (op. on rehr'g). However, section 801.109 provides an exemption from the adequate-directions-for-use requirement if the device is "[i]n the possession of a practitioner, such as physicians, dentists, and veterinarians, licensed by law to use or order the use of such device" and it "[i]s to be sold only to or on the prescription or other order of such practitioner for use in the course of his professional practice."  21 C.F.R. § 801.109(a)(1) (ii), (2).

---

[4]The manufacturer filed a premarket notification (510(K)) with the Food and Drug Administration (FDA) representing that the intended use of the laser is "to remove unwanted body hair and vascular lesions." *See* 21 C.F.R. § 814.20 (2008).  In response, the FDA approved the marketing of the laser indicating that its intended use is "to remove unwanted body hair and vascular lesions" and that "the laser system . . . is restricted to sale to or use by licensed professionals [such as physicians, dentists, and veterinarians] in the United States" and, thus, is for "prescription use" not over-the-counter use. *See id.* § 801.109(a)(1) (ii), (2) (2008).

[5]
> Class II items are more complex than Class I and include such devices as oxygen masks used in anesthesiology . . . [and lasers].  These may be subject to recommendations, guidelines, post-marketing surveillance, the development of patient registries, and even the promulgation of specific performance standards, should the [Food and Drug Administration] deem them a sufficient health hazard as to require strict product specifications or warnings.

*Stamps v. Collagen Corp.*, 984 F.2d 1416, 1418 (5th Cir. 1993) (citing 21 U.S.C.A. § 306c(a)(B)).

If a device does not bear adequate directions that enable the consumer to be able to use it, the device is deemed to be misbranded under the FFDCA. *See* FFDCA § 502(f), 21 U.S.C.A. § 352(f) (1999 ed. and Supp. 2008) (setting out labeling provisions); *see also* 21 C.F.R. § 201.5 (2008) (defining "adequate directions for use" as "directions under which the layman can use a device safely and for the purposes for which it is intended"). However, if the device is exempted from the adequate-directions-for-use requirement it is not misbranded if it is in the possession of a practitioner, such as a physician, dentist or veterinarian, or is used on order of a practitioner for use in the course of his professional practice.[6] *Rayford*, 16 S.W.3d at 209 (citing 21 C.F.R. § 801.110) (1999)); *see* 21 C.F.R. § 801.109(a)(1)(ii), (2) (providing an exemption from the directions-for-use requirement).

Dr. Tesoro relies on the above restrictions, regulations, and documentation to support his contention that laser hair removal treatment constitutes "health care," making Alvarez's claim a health care liability care. We are not, however, persuaded by this argument. The restrictions upon which Dr. Tesoro relies address exemption-from-labeling requirements. They are relevant to the determination of misbranding violations of medical devices to be sold in commerce and to those already in commerce. *See Rayford*, 16 S.W.3d at 205. The provisions are not specific performance standards; they form no predicate for a health care liability claim.[7]

---

[6]"Order" refers to a physician's order, standing medical order, standing delegation order, or other order for protocol as noted by Rep. Byron Cook in H.B. 3368, a bill introduced to the 80th Texas Legislature but not enacted. *See* Tex. H.B. 3368, § 157.152(5), 80th Leg., R.S. (2007).

[7]Dr. Tesoro does not argue that medical expert testimony would be necessary for Alvarez to establish that the laser machine was used improperly. *See Diversicare Gen. Partners, Inc. v. Rubio*, 185 S.W.3d 842, 848 (Tex. 2005); *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 544 (Tex. 2004) (noting that one consideration in determining whether alleged act or omission is inseparable part of rendition of health care is whether proving claim would require specialized knowledge of a medical expert). Even if it is later

**D. Other Factors to Consider**

**1. Operators of Laser Device**

Although the above regulations provide for physician involvement in the use of laser hair removal devices, Dr. Tesoro refers us to no FDA regulation, or to authority of any kind, that requires operators who use the MeDioStar HC laser for hair removal to be physicians or other heath care providers. It appears that there are no requirements in Texas for operators with respect to medical qualifications, credentialing, or licensure.[8] It is even unclear as to what training, if any, is required. Thus, although the laser is to be delivered to or in the possession of a physician or used on order of a physician, the laser hair removal device could be used by a lay person without a physician or a health care provider present. This factor has significance in our determination of the nature of Alvarez's claim.

**2. Other Jurisdictions**

Moreover, while we have no binding Texas authority on the issue of whether laser hair removal is a health care service, other jurisdictions have addressed the issue within the meaning of their respective medical malpractice acts. In *OB-GYN Assocs. of N. Ind.*

---

determined that medical expert testimony is needed, it is clear to us for the reasons detailed above that the nature of Alvarez's claims does not constitute health care liability claims invoking chapter 74. *See Pallares v. Magic Valley Electric Coop., Inc.*, 267 S.W.3d 67, 74-75 (Tex. App.–Corpus Christi 2008, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (Vernon 2005); *see, e.g.,Yamada v. Friend*, No. 2-07-177-CV, 2008 Tex. App. LEXIS 1680, at *10 (Tex. App.–Fort Worth Feb. 28, 2008, pet. granted) (mem. op.) ("The fact that expert medical testimony may be needed at some point in a case does not perforce create a health care liability claim")). Therefore, we need not address the issue of expert testimony as it is not necessary to the final disposition of the appeal. *See* TEX. R. APP. P. 47.1.

[8]We note that the American Board of Laser Surgery is the sole medical testing board in the United States for laser surgery, providing certification for medical professions. *See* http://www.americanboardoflasersurgery.org/ The American Board of Laser Surgery was incorporated in 1984 and has as its mission statement the following: "[f]ounded to promote the safe and efficacious use of lasers in medicine and surgery by establishing standards of acceptable levels of knowledge and competence through a certifying examination for medical professionals." *Id.*

*v. Ransbottom*, being guided by the substance of the claim with primary emphasis on "the causal connection between the conduct and the nature of the patient and healthcare provider relationship," the Indiana Court of Appeals addressed the following significant considerations in arriving at the conclusion that laser hair removal treatment did not constitute "health care" within the meaning of the Indiana Medical Malpractice Act: (1) "physicians were not involved in [the] treatment,"and (2) "the operator of the laser machine was not required to be a healthcare worker or possess healthcare credentials such as medical degrees, medical licensure, or medical certification in order to operate the machine." 885 N.E.2d 734, 739-40 (Ind. Ct. App. 2008). Other factors the court considered that favored a health-care finding included (1) the site of the treatment—a medical facility, (2) a registered nurse employed at the facility operated the laser machine, and (3) the laser machine is a piece of equipment intended to work on the human body and its misuse could cause injury. *Id.* Of marginal significance weighing in favor of it being a non-health care determination was that the laser treatment was entirely cosmetic. *Id.* In answer to the question, "What is it that distinguishes claims against medical providers as sounding in standard negligence or medical malpractice?", the Indiana Court of Appeals answered as follows:

> In this case, it is the fact that laser hair removal treatment may be administered without the involvement of medical doctors. As we have already observed several times, no physician participated in Ransbottom's laser hair removal treatment. Moreover, and significantly, no healthcare professional was *required* to. A doctor-patient relationship is a prerequisite to maintaining a malpractice action. As a general rule, where a doctor does not in any way participate in the plaintiff's care or treatment, a doctor-patient relationship will not be found to exist.

15

*Id.* at 740 (citations omitted). The court concluded that the laser hair removal treatment did not constitute "health care" within the meaning of Indiana's medical malpractice act. *Id.*

In *Mitchell v. McEvoy*, a statute-of-limitations summary judgment case, the Missouri Court of Appeals addressed the issue of whether laser hair removal is a "health care service" under section 516.105 of the Missouri Revised Statutes. 237 S.W.3d 257, 260 (Mo. App. 2007). In *Mitchell*, the laser hair treatment was performed by a registered nurse at a physician's office located on a medical center campus. *Id.* at 258. Mitchell claimed that McEvoy was negligent because she (1) failed to test or inspect the laser hair removal device; (2) failed to observe the damage done by the defective device before the completion of the treatment; or (3) calibrated or damaged the device causing it to lose calibration prior to the treatment. *Id.* McEvoy argued that the claim was a "health care service" because "she performed the procedure during the course of her employment with [a physician]," and "as part of her practice of her profession as a nurse." *Id.* at 260. The court's research revealed that laser hair removal was wholly unregulated in Missouri and that, although the legislators have proposed a bill "which would authorize the promulgation of rules regarding the training and authorized use of lasers and pulse light sources by cosmetologists," direct the state board to identify lasers capable of coagulating tissue, and require a licensed physician to directly supervise the use of such lasers, as of the date the opinion issued, the bill had not yet been acted upon. *Id.* at 261. The court noted that the bill, although not enacted, brought to light the amount of information that was lacking in the record before it, including, among other things, that although McEvoy stated she was

16

performing the procedure in the course of her employment as a nurse, she did not state whether she performed the procedure under the supervision of the physician. *Id.* Based on this reasoning, the Missouri Court of Appeals determined, in this summary-judgment case, that the trial court did not have sufficient evidence to conclude, as a matter of law, that the defendant was performing a "health care service" and, thus, did not establish that the two-year health care statute of limitations controlled. *Id.*

### 3. Texas Legislation and Texas Medical Board "Laser Rule"

We acknowledge that the above opinions are not controlling. However, the reasoning provided by both courts is informative, especially in light of an additional factor relevant to our analysis; that factor being recent action or inaction of the Texas Medical Board (TMB) and the Texas Legislature regarding laser hair removal legislation. *See* Laura Jeanne Sanger, *Laser Hair Removal*, Health Law Perspectives, April 2008, http://www.law.uh.edu/healthlaw/perspectives/2008%20(LSK)laser.pdf (discussing the general history and status of Texas rules, litigation, and legislation involving laser hair removal).

In 2003, the Texas Medical Board (TMB) sought to establish guidance regarding the use of lasers in laser hair removal, guidance referred to as the Laser Rule. *Id.* at p.3 (citing TMB Rules, Sec. 193.11, *Use of Lasers* (22 Tex. Admin. Code § 193.11)). The Laser Rule's enactment was delayed when two declaratory judgment lawsuits were filed in Travis County challenging the physician supervision and training requirements set forth in the Laser Rule. *See id.* at pp.3-4 (citing *Finder v. Tex. State Board of Med. Examiners,* No. GN400891 (98th Ct., Travis County, Tex. Mar. 16, 2004); *Laser Hair Removal Stakeholders Group v. Tex. State Board of Med. Examiners*, No. GN403910 (201st Ct.,

17

Travis County, Tex. Dec. 1, 2004)). The parties subsequently agreed to abate the cases and the enforcement of the Laser Rule, pending action by the Texas Legislature. *Id.* at p. 4 (citing TMB, *Information and Current Standing: Standing Delegation Orders and Rule 1 9 3 . 1 1 U s e o f L a s e r s ,* http://www.tmb.state.tx.us/professionals/calendar/minutes/doc/2004/December04/).

Legislation related to laser hair removal that was introduced to the 79th legislative session was not enacted. During the 80th legislative session, two house bills were introduced. *See* Tex. H.B. 174, 80th Leg., R.S. (2007); Tex. H.B. 3368, 80th Leg., R.S. (2007). House Bill 174 was introduced as an amendment to the Texas Occupations Code. *See* Tex. H.B. 174, § 1604.001-.411, 80th Leg., R.S. (2007) (addressing the regulation of laser hair removal facilities and providing civil penalties for non-compliance). It proposed adding chapter 1604, "Laser Hair Removal," to Title 9, "Regulation of Barbers, Cosmetologists, and Related Occupations." *See id*. House Bill 174 provided that laser hair removal procedures were "neither the practice of medicine nor a medical procedure." *Id.* § 1604.002.

Subsequently, House Bill 3368 was introduced in the 80th Legislature as an amendment to chapter 157 of the occupations code, a chapter that provides for authority of physicians to delegate certain medical acts. *See* Tex. H.B. 3368, §§ 157.151-.157, 80th Leg., R.S. (2007). It differed significantly from the earlier house bill. House Bill 3368 provided for the addition of a subchapter to the occupations code that provided physicians with authority to delegate certain medical acts and to supervise non-physicians performing medical acts, specifically certain laser hair removal procedures. *See id.* It also stated "laser hair removal treatments, procedures or services are the practice of medicine and

18

may only be performed or delegated in accordance with this [Medical Practice] Act." *Id.* § 157.152.

Neither House Bill 174 nor House Bill 3368 was enacted. Furthermore, on June 27, 2008, a motion was passed by the Texas Medical Board which, in part, repealed the Laser Rule. *See* TMB, *Board Meeting Minutes June 27, 2008,* http://www.tmb.state.tx.us/professionals/calendar/minutes/doc/2008/june26/Full_Board_mi. . .) (citing 22 Tex. Admin. Code § 193).

Recently, two bills have been introduced to the 81st legislative session. House Bill 449, regarding the regulation of a laser hair removal facility, was introduced as an amendment to health and safety code, chapter 401, titled "Radioactive Materials and other Sources of Radiation." *See* Tex. H.B. 449, 81st Leg., R.S. (2009). The bill does not state whether or not the procedures are the practice of medicine. House Bill 449 does provide, as did House Bill 174, for certification of and continuing education for laser hair removal professionals, senior laser hair removal technicians, laser hair removal technicians, and laser hair removal apprentice-in-training. *Id.* § 401.054-509. It also requires a facility license. *Id.* § 401.510. Finally, House Bill 449 provides for a consulting physician who would establish proper protocols for services provided at the facility and who must be available for emergency consultation with the facility. *Id.* § 401.519. House Bill 449 was filed on December 19, 2008, and was read to the House for the first time and referred to the House Committee on Public Affairs on February 18, 2009.

House Bill 574 was also introduced to the 81st Texas Legislature as an addition to the Texas Health and Safety Code, Title 2, Health, and Subtitle G, Licenses. *See* Tex. H.B. 574, 81st Leg., R.S. (2009). This bill addresses disclosures that must be made at a

19

facility performing certain laser cosmetic procedures. *See id.* House Bill 574 was filed on January 12, 2009 and, like House Bill 449, was read to the House for the first time and referred to the House Committee on Public Affairs on February 18, 2009.

## E. Analysis Considering All Factors and Circumstances

In sum, we consider all of the factors and circumstances set out above in determining the nature of Alvarez's claims. Alvarez's allegations assert improper use of the laser. The substance of Alvarez's negligence claim is that Blount's improper use of the laser device caused her injuries; it is not that Blount provided health care treatment that caused her injuries. The substance of her allegations is that Dr. Tesoro, through Blount, failed to properly use the laser during the hair removal process; it is not that Dr. Tesoro vicariously failed to provide proper health care treatment. Alvarez's claim does not center on any medical treatment provided by Dr. Tesoro or on breaches of medical care or of nursing care, but rather on Blount's use of the laser during the hair removal process. As we concluded above, Alvarez framed her claims only as common law negligence claims—that Blount was negligent when he used the laser improperly and that Dr. Tesoro was vicariously liable for Blount's actions.

Based on Alvarez's petition, Dr. Tesoro was sued only as a general partner of TSMAC where the procedure was performed. Blount was identified as Dr. Tesoro's agent. Based on our review of the record, Dr. Tesoro neither supervised nor participated in the laser hair removal procedure performed by Blount, not even by prescription or other order as required by the FDA. Without involvement in Alvarez's care, no doctor-patient relationship would be found to exist between Alvarez and Dr. Tesoro. *See St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995) ("The duty to treat the patient with proper

20

professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice."); *Ramirez v. Carreras*, 10 S.W.3d 757, 761 (Tex. App.–Corpus Christi 2000, pet. denied). And, importantly, the laser hair removal device could be used without a physician or a health care provider present as no healthcare professional is even *required* to participate in a procedure. These concerns are not changed by the fact that the procedure was performed at a medical clinic by a person who happened to be a registered nurse. Laser hair removal is unregulated in Texas at this time, and it is apparent that the Texas Legislature is uncertain regarding its position on such regulation. Although laser hair removal bills have been proposed, none have been enacted. Likewise, the Texas Medical Board has withdrawn its position on this issue, apparently waiting for the legislature to act.

Therefore, examining the underlying nature of Alvarez's claim, *Rose*, 156 S.W.3d at 543, and being careful not to extend chapter 74's reach beyond its stated bounds, *Pallares,* 267 S.W.3d at 71, we conclude that the alleged act of improperly using the laser is not, in this case, an inseparable part of the rendition of health care services. *See Diversicare*, 185 S.W.3d at 849 (Tex. 2005); *Rose*, 156 S.W.3d at 544. Thus, the second element of the definition of a "health care liability claim"—that laser hair removal involves treatment related to health care—is not satisfied, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13), and Alvarez's allegations do not constitute a health care liability claim. Alvarez alleged only an ordinary negligence claim. To whatever extent the complained-of act could have been stated as a health care liability claim, it was simply not cast as such by Alvarez. We overrule Dr. Tesoro's first and third issues.

21

## V. Filing of Expert Report

By his fourth issue, Dr. Tesoro contends that the trial court erred by denying his motion to dismiss because Alvarez failed to file an expert report within 120 days of filing her claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). However, because Alvarez did not assert a health care liability claim, she was not required to file an expert report. *See id.* We overrule Dr. Tesoro's fourth issue.

## VI. Conclusion

Accordingly, we affirm the trial court's denial of Dr. Tesoro's motion to dismiss.

NELDA V. RODRIGUEZ
Justice

Opinion delivered and filed this
12th day of March, 2009.