# FOR PUBLICATION

ATTORNEYS FOR APPELLANT

**DAVID B. WILSON**
Indianapolis, Indiana

**W. BRENT GILL**
Nunn Law Office
Bloomington, Indiana

ATTORNEY FOR APPELLEE
ADULT AND CHILD MENTAL
HEALTH CENTER

**SHERI BRADTKE McNEIL**
Kopka, Pinkus, Dolin & Eads, P.C.
Crown Point, Indiana

FILED
Nov 21 2013, 9:01 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| B.R., a Minor, by his Guardian, Teresa Todd, | ) | |
| Appellant-Plaintiff, | ) | |
| vs. | ) | |
| STATE OF INDIANA, INDIANA DEPARTMENT OF CHILD SERVICES, MORGAN COUNTY OFFICE OF DEPARTMENT OF CHILD SERVICES, and ADULT AND CHILD MENTAL HEALTH CENTER, INC., | ) | No. 55A05-1212-CT-639 |
| Appellee-Defendants. | ) | |

APPEAL FROM THE MORGAN SUPERIOR COURT
The Honorable Frank M. Nardi, Special Judge
Cause No. 55D01-0806-CT-0320

**November 21, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

B.R., by his guardian, Teresa Todd argues that the trial court erred when it granted the Adult and Child Mental Health Center's ("the Health Center") Trial Rule 12(B)(1) motion to dismiss for lack of subject matter jurisdiction. The precise issue presented in this appeal is whether the Health Center was providing "health care" when it placed B.R. in respite therapeutic foster care, and therefore, whether B.R.'s claim was subject to the Indiana Medical Malpractice Act.

We reverse and remand for proceedings consistent with this opinion.

**Facts and Procedural History**

The Health Center is a certified mental health center in Indiana. The Health Center provides clinical services to children to address emotional, behavioral, and educational needs to children in foster care. The Health Center has a contract with the Marion County Office of Indiana Department of Child Services ("DCS") authorizing it to assess children removed from their homes, to provide recommendations for services for those children, to provide for their psychological and psychiatric needs, and to facilitate therapeutic foster care placements.

In July 2007, B.R. was three years old when DCS removed him from his home and placed him in therapeutic foster care. B.R. was referred to the Health Center for a mental health assessment. He was diagnosed with neglect of a child and disruptive behavior disorder. B.R. was also significantly developmentally delayed.

For all of these reasons, B.R. was placed with therapeutic foster parents Michelle Foster and Darrell Riley. A Health Center employee supervised this placement and served as B.R.'s case manager. Because therapeutic foster care can be quite stressful,

respite care is made available from time to time, and Michelle Foster requested respite care for the weekend of September 21 to 23, 2007. B.R.'s case manager arranged for him to be placed in respite care with therapeutic foster parents Mark and Penny Hughes.

On September 22, 2007, B.R. ran from the Hugheses' residence onto an adjacent property where a swimming pool was located. B.R. entered the pool, and he was later found floating facedown and non-responsive. B.R. suffered catastrophic brain damage as a result of this near drowning.

This case was initiated under two separate cause numbers when B.R.'s biological parents individually filed complaints against the Hugheses and their neighbor. The biological parents were then ordered to file a joint complaint under a new cause number. On July 16, 2008, the joint complaint was filed, which added the following defendants: Indiana Department of Child Services, Marion County Department of Child Services, Morgan County Department of Child Services, Morgan County Emergency Management Agency, Green Township Fire Rescue, Michelle Foster, and Darrell Riley. The biological parents later amended their complaint and also added the Health Center as a defendant.

On July 2, 2009, the Health Center filed a motion for summary judgment and the trial court entered an order granting partial summary judgment. The trial court concluded that the following genuine issues of material fact precluded the entry of summary judgment: whether the Health Center adequately monitored and supervised B.R. and the Hugheses while B.R. was in their care, whether the Health Center was negligent in their inspection of the Hugheses' home and the surrounding area, and whether the Health

3

Center was negligent for placing B.R. in the Hugheses' home. However, the trial court granted partial summary judgment on other issues such as whether the Health Center adequately trains foster parents and has proper procedures, assessments, and training for managing children with special needs or disabilities.

On September 7, 2011, with the trial court's permission, B.R. filed a second amended complaint for damages[1] naming B.R. as the plaintiff, by his guardian Theresa Todd. In the complaint, B.R. alleged that the Health Center breached its duty to B.R. by (1) providing inadequate supervision and monitoring of B.R. while he was placed in therapeutic foster care; (2) failing to adequately supervise B.R.'s foster parents; (3) failing to provide for adequate supervision of B.R. by his foster parents; (4) failing to properly place B.R. given his special needs and disabilities; (5) failing to adequately inspect the Hugheses' home and surrounding area; (6) failing to adequately inspect the Hugheses' property before placing B.R. in the home; (7) failing to adequately inspect the surrounding area and neighborhood of the Hugheses' home to ensure B.R.'s safety; (8) failing to inform the Hugheses that B.R. needed to be watched at all times for his own protection and safety; (9) failing to warn the Hugheses that B.R. had a tendency to run away; and (10) failing to take appropriate precautions to protect B.R. given his special needs and characteristics. Appellant's App. pp. 198-207.

The Health Center filed an answer to the second amended complaint and admitted its contractual relationship with DCS. The Health Center also pled immunity under the

---

[1] Certain previously named defendants were dismissed prior to the filing of the second amended complaint under either settlement agreements or other dispositive motions.

Tort Claims Act as an affirmative defense. Other motions were filed and adjudicated, and eventually, on August 9, 2012, the Health Center filed its motion to dismiss pursuant to Trial Rule 12(B)(1). In the motion, the Health Center alleged that B.R.'s action is a malpractice claim against a health care provider, which claim is subject to review by a medical review panel, and that since B.R. had not submitted his claim through the review panel process, the trial court lacked subject matter jurisdiction. A hearing was held on the motion, and on November 7, 2012, the trial court entered an order granting the Health Center's motion to dismiss. B.R., by his guardian Teresa Todd, now appeals.[2]

## Standard of Review

"Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings then before the court belong." Hubbard v. Columbia Women's Hosp. of Indianapolis, 807 N.E.2d 45, 50 (Ind. Ct. App. 2004).

> In ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court may consider not only the complaint and motion but also any affidavits or evidence submitted in support. The trial court may weigh the evidence to resolve the jurisdictional issue. The standard of appellate review for Trial Rule 12(B)(1) motions to dismiss is dependent upon what occurred in the trial court, that is: (i) whether the trial court resolved disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a "paper record."

Wishard Mem'l Hosp. v. Kerr, 846 N.E.2d 1083, 1087 (Ind. Ct. App. 2006) (internal quotations and citations omitted). Furthermore,

> If the facts before the trial court are in dispute, then our standard of review focuses on whether the trial court conducted an evidentiary hearing.

---

[2] We held oral argument in this case on October 24, 2013 at the Indiana University Robert H. McKinney School of Law. We thank the Law School for its generous hospitality and counsel for the quality of their written and oral advocacy.

5

> Under those circumstances, the court typically engages in its classic fact-finding function, often evaluating the character and credibility of witnesses. Thus, where the trial court conducts an evidentiary hearing, we give its factual findings and judgment deference. . . .
>
> However, where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is in as good a position as the trial court to determine whether the court has subject matter jurisdiction. Thus, we review de novo a trial court's ruling on a motion to dismiss where the facts before the court are disputed and the trial court rules on a paper record.

GKN Co. v. Magness, 744 N.E.2d 397, 401 (Ind. 2001) (internal quotations and citations omitted).

Here, the jurisdictional facts were in dispute and the trial court held a hearing, which is most fairly characterized as an oral argument, rather than an evidentiary hearing. Therefore, the appropriate standard of review is de novo. See Popovich v. Danielson, 896 N.E.2d 1196 (Ind. Ct. App. 2008) (de novo review is appropriate where the trial court rules on a motion to dismiss for lack of subject matter jurisdiction and holds a hearing at which the parties present legal arguments), trans. denied.

## I. Medical Malpractice Act

To resolve the issues presented in this appeal, we proceed under the principle that the statutory procedures for bringing a medical malpractice action are in derogation of common law, and as such, they are to be strictly construed against limiting a claimant's right to bring suit. Weldon v. Universal Reagents, Inc., 714 N.E.2d 1104, 1107 (Ind. Ct. App. 1999). When the legislature enacts a statute in derogation of common law, we presume that the legislature is aware of the common law, and does not intend to make any change beyond what is declared in express terms or by unmistakable implication. Id.

6

The Medical Malpractice Act, Indiana Code article 34-18, applies to a patient or the representative of a patient who has a claim "for bodily injury or death on account of malpractice[.]" I.C. § 34-18-8-1. "Malpractice" is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." I.C. § 34-18-2-18. A "patient" is "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." I.C. § 34-18-2-22. And "health care" is "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." I.C. § 34-18-2-13.

Indiana Code section 34-18-8-4 provides that "an action against a health care provider may not be commenced in a court in Indiana before: (1) the claimant's proposed complaint has been presented to a medical review panel established under IC 34-18-10 (or IC 27-12-10 before its repeal); and (2) an opinion is given by the panel." Simply said, the Act grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court. H.D. v. BHC Meadows Hosp., Inc., 884 N.E.2d 849, 853 (Ind. Ct. App. 2008), trans. denied (citation omitted).

B.R. concedes that the Health Center is a "health care provider" as that entity is defined in the Medical Malpractice Act and is therefore eligible for coverage under the Act. See I.C. §§ 34-18-2-13(3); 34-18-2-14. The Indiana Family and Social Services,

7

through its Division of Mental Health and Addiction, certifies and regulates community health centers. See I.C. § 12-21-2-3. Mental health centers are required to have a combination of licensed clinical social workers, licensed mental health counselors, licensed family therapists, clinical nurse specialists, licensed psychologists and licensed psychiatrists on staff.

However, the Health Center's certification by the Division of Mental Health and Addiction does not allow it to facilitate and supervise foster care placements. Only DCS has authority to license entities to make and supervise foster care placements. I.C. § 31-27-6-1. And child placement agencies are governed by regulations issued by DCS. Therefore, the Health Center's authority to make therapeutic foster care placements arises solely from its contract with DCS.

## II. Was the Health Center providing health care to B.R. when it placed him with the Hugheses, as that term is defined in Indiana Code section 34-18-2-18?

As stated above, the Medical Malpractice Act defines "malpractice" as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." I.C. § 34-18-2-18. Importantly, the Medical Malpractice Act "pertains to curative or salutary conduct of a health care provider acting within his or her professional capacity[.]" Murphy v. Mortell, 684 N.E.2d 1185, 1188 (Ind. Ct. App. 1997), trans. denied. Moreover, the Act is designed to exclude that conduct which is not related to "'the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" Id. (citation omitted); see also Peters v. Cummins Mental Health, Inc., 790 N.E.2d 572, 576

8

(Ind. Ct. App. 2003), trans. denied (stating "[t]he Act is not all-inclusive as to claims against medical providers, and a claim against a medical provider sounding in general negligence . . . rather than medical malpractice is outside the Act").

Therefore, the plaintiff's status as a patient of a health care facility is not dispositive in determining whether the claim sounds in medical malpractice. Estate of O'Neal ex rel. Newkirk v. Bethlehem Woods Nursing & Rehab. Ctr., 878 N.E.2d 303, 311 (Ind. Ct. App. 2007). The test to determine whether a claim sounds in medical malpractice is "whether the claim is based on the provider's behavior or practices while 'acting in his professional capacity as a provider of medical services.'" Madison Ctr., Inc. v. R.R.K., 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006), trans. denied (quoting Collins v. Thakkar, 552 N.E.2d 507, 511 (Ind. Ct. App. 1990), trans. denied)). "Applying this test has resulted in hairline distinctions between claims that sound in medical negligence and those that sound in ordinary negligence."[3] Estate of O'Neal, 878 N.E.2d at 311.

A case sounds in ordinary negligence where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community. See Murphy, 684 N.E.2d at 1188. By contrast, a claim falls under the Medical Malpractice Act where there is a causal connection between the conduct

---

[3] See e.g. Methodist Hosp. of Ind., Inc. v. Rioux, 438 N.E.2d 315 (Ind. Ct. App. 1982) (addressing whether the Medical Malpractice Act applied to patient's claim for injuries sustained when she fell and broke her hip while hospitalized), disapproved of by Winona Memorial Found. of Indianapolis v. Lomax, 465 N.E.2d 731 (Ind. Ct. App. 1984) (concluding that a physical therapy patient's claim for injuries sustained at a hospital facility when she tripped over a floorboard protruding above the floor and was not receiving care or treatment when injured was not covered under the Medical Malpractice Act).

9

complained of and the nature of the patient-health care provider relationship. See Putnam Cnty. Hosp. v. Sells, 619 N.E.2d 968, 971 (Ind. Ct. App. 1993).

B.R. claims that the Health Center's decision concerning his placement and its provision of information to the respite therapeutic foster parents about his specific needs "is the practice of foster care management" and not health care. Appellant's Br. at 20. The Health Center's "liability is based on its case manager's negligence in placing [B.R.] with respite foster parents for the weekend. No physician, psychologist, or other health care professional played a role in either the placement decision or the provision of information to the respite foster parents." Id. at 21. B.R. argues that an "analysis of whether a health care provider's professional services constituted 'health care' focuses on whether a health care professional is required to participate in the provided services." Id. at 25.

In OB-GYN Associates of Northern Indiana P.C. v. Ransbottom, our court considered whether cosmetic laser hair removal was "health care" within the meaning of the Medical Malpractice Act. 885 N.E.2d 734, 735 (Ind. Ct. App. 2008), trans. denied. The laser hair removal at issue in that case was performed by a nurse in a physician's office, but we did not find those facts to be determinative. We concluded that cosmetic laser hair removal was not health care because "physicians were not involved in Ransbottom's treatment, and the operator of the laser machine was not required to be a healthcare worker or possess healthcare credentials such as medical degrees, medical licensure, or medical certification in order to operate the machine." Id. at 739. We also stated:

10

> [T]his treatment can be, and often is, legally administered in beauty salons by beauty salon employees. With this in mind, it appears that, but for the fact that the laser machine's operator happened to be a registered nurse and the laser machine happened to be located in a medical facility, there would be no question but that Ransbottom's laser hair removal treatment did not constitute health care. Again, so far as we can tell, Ransbottom could have legally obtained the same treatment somewhere other than a healthcare facility, and could have legally done so without the assistance or participation of someone with valid healthcare licensing or certification credentials. In those respects, the laser hair removal treatment is analogous to tattooing or tanning, both of which alter the body for cosmetic purposes, but neither of which need be performed by a licensed or certified physician or healthcare professional.

Id. In support of this conclusion, we emphasized the fact that "no healthcare professional was *required* to" participate in the laser hair removal treatment. Id. at 740 (emphasis in original). See also Community Hosp. v. Avant, 790 N.E.2d 585, 587 (Ind. Ct. App. 2003) (holding that although the plaintiff was involved in a fitness program at a facility owned by the hospital with a trainer employed by the hospital, the plaintiff was not a "patient" as that term is used in the Medical Malpractice Act because he was not under a physician's orders to start the program as part of a medical treatment plan).

In this case, a health care professional was not required to, and a health care professional did not, participate in B.R.'s case manager's decision to place him in the Hugheses' home for respite therapeutic foster care. Moreover, such placement decisions are routinely made by individuals with no health care training. While B.R.'s respite therapeutic foster care placement decision was made by an employee of a health care provider, as we noted in Ransbottom, that fact is not determinative.

We also agree with B.R.'s argument that a medical review panel "is no more equipped to consider" the Health Center's negligence than the average juror. Appellant's

11

Br. at 26.  In Collins v. Thakkar, 552 N.E.2d 507 (Ind. Ct. App. 1990), trans. denied, our court discussed the General Assembly's purpose for requiring medical malpractice claims to be reviewed by a medical review panel:

> The text of the Act itself thus leads one to conclude that the General Assembly intended to exclude from the legislation's purview conduct of a provider unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill or judgment.
>
> * * *
>
> The legislature's establishment of a medical review panel, the sole purpose of which is to provide an expert determination on the question of whether a provider complied with the appropriate standard of care, suggests that the scope of the Act is likewise confined to actions premised upon the exercise of profession judgment.

Id. at 510-11.

The issues presented in this case surrounding B.R.'s case manager's alleged negligence are unquestionably within the understanding of the average lay juror. A medical professional is no better equipped than the average juror to consider whether the case manager complied with the appropriate standard of care.  See e.g. H.D. v. BHC Meadows Hospital, Inc., 884 N.E.2d 849, 855 (Ind. Ct. App. 2008), trans. denied (stating "[w]e fail to see why the therapist's act of faxing a patient's confidential information to a fax machine located in a school office without taking precautions to ensure that the materials are discreetly received by the intended recipient would necessitate consideration by a medical review panel" and observing that the average juror is equipped to understand the elements of invasion of privacy).

Yet, the Health Center argues that this case falls under the purview of the Medical Malpractice Act because, under its interpretation of the Act, a licensed social worker

12

could serve on a medical review panel. Indiana Code section 34-18-10-5 provides that "all health care providers in Indiana, whether in the teaching profession or otherwise, who hold a license to practice in their profession shall be available for selection as members of the medical review panel. Health facility administrators may not be members of the medical review panel." A "health care provider" is defined in part as

> An individual, a partnership, a limited liability company, a corporation, a professional corporation, a facility, or an institution licensed or legally authorized by this state to provide health care or professional services as a physician, psychiatric hospital, hospital, health facility, emergency ambulance service (IC 16-18-2-107), dentist, registered or licensed practical nurse, physician assistant, certified nurse midwife, optometrist, podiatrist, chiropractor, physical therapist, respiratory care practitioner, occupational therapist, psychologist, paramedic, advanced emergency medical technician, or emergency medical technician, *or a person who is an officer, employee, or agent of the individual, partnership, corporation, professional corporation, facility, or institution acting in the course and scope of the person's employment*.

I.C. § 34-18-2-14 (emphasis added).

We are not persuaded by the Health Center's reliance on this "catch-all provision." Considering the statute as a whole and the purpose of the Medical Malpractice Act, we conclude that the catch-all provision applies to persons providing health care to patients by virtue of their employment with a health care provider. To reach the conclusion urged by the Health Center, that a licensed individual need only be employed by a health care provider to serve on a medical review panel, would lead to absurd results. For example, under the Health Center's interpretation of the statute, a certified public accountant employed by a health care provider would be eligible to serve on a medical review panel. Our review of the Medical Malpractice Act leads us to conclude that the General

13

Assembly did not intend that result.  See Ind. Pesticide Rev. Bd. v. Black Diamond Pest & Termite Control Inc., 916 N.E.2d 168, 181 (Ind. Ct. App. 2009) (stating that the goal of statutory construction is to determine, give effect to, and implement the intent of the legislature), trans. denied.

**Conclusion**

The allegations in B.R.'s complaint, i.e. that his case manager negligently placed him with the respite therapeutic foster parents and negligently failed to inform the foster parents that B.R. was an overly active child known to run from adults and escape his home, are not directly related to any medical care B.R. received from the Health Center. Furthermore, the foster care placement was not made by a health care professional. Because B.R.'s claims sound in general negligence, his claims fall outside the Medical Malpractice Act.  See Peters, 790 N.E.2d at 576.  For all of these reasons, we conclude that the trial court erred when it granted the Health Center's Trial Rule 12(B)(1) motion to dismiss.

Reversed and remanded for proceedings consistent with this opinion.

NAJAM, J., and BAILEY, J., concur.

14