

FILED

Jul 12 2019, 7:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Daniel H. Pfeifer
James P. Barth
Jeffrey J. Stesiak
South Bend, Indiana

ATTORNEY FOR APPELLEE

Robert J. Palmer
Mishawaka, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Linda Martinez, as the Personal Representative of the Estate of Roy Martinez,<br><br>*Appellant-Plaintiff,*<br><br>v.<br><br>Oaklawn Psychiatric Center, Inc.,<br><br>*Appellee-Defendant*. | July 12, 2019<br><br>Court of Appeals Case No. 18A-CT-2883<br><br>Appeal from the St. Joseph Superior Court<br><br>The Honorable Jenny Pitts Manier, Judge<br><br>Trial Court Cause No. 71D05-1803-CT-140 |

**Mathias, Judge.**

[1] The issue presented in this appeal is whether the claim in this case alleges facts that fall under Indiana's Medical Malpractice Act ("the Act"), or whether the facts allege pure negligence or premises liability outside the definitions of the Act. The St. Joseph Superior Court granted Oaklawn Psychiatric Center, Inc.'s

("Oaklawn") motion to dismiss under Trial Rule 12(B)(1) for lack of subject matter jurisdiction. Linda Martinez, as the personal representative of the estate of Roy Martinez ("the Estate"), appeals the dismissal, arguing that Oaklawn is liable based on the theory of premises liability.[1]

We affirm.

## Facts and Procedural History

After five months of inpatient treatment for mental illness, on February 2, 2017, Roy Martinez ("Martinez") was admitted to Metcalf House, a voluntary group home operated by Oaklawn[2] that offers supervised living for patients who do not require inpatient services. Metcalf House is licensed as a Supervised Group Living home through the Indiana Department of Mental Health and Addictions and is a qualified health care provider in accordance with Indiana Code section 34-18-2-24.5. Appellant's Conf. App. p. 44.

Oaklawn employees at Metcalf House called "residential assistants" are responsible for helping residents develop or improve their ability to function independently. Specifically, resident assistants help the residents establish and maintain routines and manage daily activities like hygiene, self-administering medication, and transportation. Metcalf House residential assistants are trained

---

[1] We held oral argument in this case on June 12, 2019 at the Jewish Community Center in Indianapolis. We extend our gratitude to the Center and its staff for their gracious hospitality. We also thank counsel for the quality of their written and oral advocacy.

[2] Oaklawn provides mental health and addictions services in St. Joseph and Elkhart Counties, Indiana.

annually in non-violent, verbal de-escalation strategies. Appellant's Conf. App. p. 79. Residential assistants are also trained to call 911 when medical attention is required and to remove themselves from possibly violent situations. Appellant's Conf. App. p. 92.

[5] The Estate's complaint arises from an incident that occurred between Martinez and residential assistant Kennedy Kafatia ("Kafatia"). At approximately 12:30 a.m. on August 3, 2017, the South Bend Police Department responded to a reported assault at Metcalf House. Kafatia reported to the responding officer that he had walked into the living room where Martinez was watching television around midnight and told Martinez he had to go to bed because it was past curfew. Martinez allegedly refused and stated that he wanted to finish his show and drink first. Kafatia said that he walked near Martinez to turn off the lamp, and a struggle for the lamp ensued. When both men dropped the lamp, Kafatia explained that Martinez attempted to charge at him, and in response, Kafatia fell back slightly, extended his right foot, and kicked Martinez, causing a large laceration to his right shin. Martinez reportedly fell backwards into his chair, and his shin started bleeding. Martinez then walked to the kitchen and called 911. Rather than following Martinez into the kitchen, Kafatia remained in the living room to wait for the police, which was consistent with Oaklawn's protocol for handling altercations with the psychiatric patients of Metcalf House.

[6] The responding officer observed Martinez sitting on a chair in the kitchen with a large amount of blood around him. Martinez was still breathing and making

grunting noises but was unconscious. While waiting for medics to respond, Martinez suddenly stopped breathing. Two officers began CPR until medics arrived and took over, and Martinez was transported by ambulance to a local hospital. At approximately 1:41 a.m., Martinez was pronounced dead. Kafatia was transported to the police department where he was arrested for battery resulting in death. Appellant's Conf. App. pp. 50–51.

[7] On March 23, 2018, the Estate filed a complaint alleging that Kafatia, acting in the course and scope of his employment, "negligently or recklessly" injured Martinez, resulting in his death. The complaint states that "[a]fter [Martinez] began bleeding, neither the employee supervising and working at Metcalf House nor employees of [Oaklawn] exercised reasonable care by providing basic first aid to [Martinez] or attempting to procure other medical aid or assistance. Appellant's App. pp. 16–17. The Estate also asserts that Oaklawn is "vicariously liable for [Kafatia's] actions, as well as any other employees or supervisors who failed to assist [Martinez]." Appellant's App. p. 17.

[8] Specifically, the Estate alleged that Oaklawn is separately liable to Martinez for:

    A. Negligently supervising Martinez;

    B. Negligently supervising Kafatia;

    C. Failing to provide a safe living environment for Martinez;

    D. Failing to provide adequate personnel and staffing to supervise the residents of Metcalf House;

    E. Failing to provide proper training to the staff on the use of first aid and when to use first aid;

F.   Failing to properly train staff on when to call for assistance; and

G.   Failing to provide safety and protection for Martinez and the residents of Metcalf House.

Appellant's App. pp. 17–18.

[9]   On May 15, 2018, Oaklawn filed its Answer and Affirmative Defenses, stating in relevant part that "[t]his court lacks the requisite subject matter jurisdiction over this Complaint because [the Estate] has raised allegations of medical malpractice, but has failed to proceed through the medical review panel process." Appellant's App. p. 22. Thereafter, Oaklawn filed a Motion to Dismiss pursuant to Trial Rule 12(B)(1) on September 7, 2018.

[10]  The trial court held a hearing on the motion on October 23, 2018. On November 27, 2018, the trial court entered an order finding that "[w]hether the conduct of [Oaklawn] and/or [Kafatia] was negligent, or the exercise of professional judgment compromised, the conduct alleged is not 'unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" Appellant's App. p. 15 (citation omitted). Therefore, the trial court determined that the Estate's claims fell under the Act and granted Oaklawn's motion to dismiss. *Id.* The Estate now appeals.

## Standard of Review

[11]  The standard of review on an appeal of a case like this, which is decided under Trial Rule 12(B)(1), is an unusual, but critical, component of our decision-making process. A trial court ruling on a motion to dismiss for lack of subject

matter jurisdiction under Trial Rule 12(B)(1), unlike a trial court ruling on a motion to dismiss under Trial Rule 12(B)(6), may consider not only the complaint, but also any affidavits or other evidence presented and submitted on the issue of subject matter jurisdiction. *B.R. ex rel. Todd v. State*, 1 N.E.3d 708, 712 (Ind. Ct. App. 2013), *trans. denied*. If such evidence is presented, the trial court may weigh the evidence to resolve the jurisdictional issue. *Id*. On appeal, our standard of review depends on what occurred in the trial court, that is, whether the trial court resolved disputed facts, and if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a "paper record." *Id.*

> If the facts before the trial court are not in dispute, then the question of subject matter jurisdiction is purely one of law. Under those circumstances no deference is afforded the trial court's conclusion because appellate courts independently, and without the slightest deference to trial court determinations, evaluate those issues they deem to be questions of law. Thus, we review de novo a trial court's ruling on a motion to dismiss under Trial Rule 12(B)(1) where the facts before the trial court are undisputed.

> If the facts before the trial court are in dispute, then our standard of review focuses on whether the trial court conducted an evidentiary hearing. Under those circumstances, the court typically engages in its classic fact-finding function, often evaluating the character and credibility of witnesses. Thus, where a trial court conducts an evidentiary hearing, we give its factual findings and judgment deference. And in reviewing the trial court's factual findings and judgment, we will reverse only if they are clearly erroneous. Factual findings are clearly erroneous if the evidence does not support them, and a judgment is clearly

erroneous if it is unsupported by the factual findings or conclusions of law.

However, where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is in as good a position as the trial court to determine whether the court has subject matter jurisdiction. Thus, we review de novo a trial court's ruling on a motion to dismiss where the facts before the court are disputed and the trial court rules on a paper record.

*GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001) (citations and internal quotations omitted). In this case, the trial court considered the following evidence in the record: the affidavit of Laurie Nafziger, the president and CEO of Oaklawn Psychiatric Center, Inc., the South Bend Police Department's case report, and the deposition of Lisa Johnson, Kafatia's supervisor and the team leader of supervised group living at Oaklawn.

[12] The facts set forth above are undisputed. Moreover, although the trial court held a hearing on the motion to dismiss, the hearing was simply an oral argument, as the parties presented no additional evidence and no witnesses were sworn. Accordingly, we apply a de novo standard of review based on the paper record before us. *See B.R. ex rel. Todd*, 1 N.E.3d at 713 (applying de novo standard where trial court held hearing at which parties made legal arguments and did not present evidence) (citation omitted).

# Discussion and Decision

[13] The Medical Malpractice Act authorizes a patient who has a claim for bodily injury or death due to medical malpractice to file a complaint in any court with jurisdiction. Ind. Code § 34-18-8-1; *Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App. 2014). However, Indiana Code section 34-18-8-4 creates a condition precedent to trying a medical malpractice case in court, namely, that "an action against a health care provider may not be commenced in a court in Indiana before: (1) the claimant's proposed complaint has been presented to a medical review panel ... and (2) an opinion is given by the panel." Thus, until a medical review panel has issued its opinion, the trial court has no jurisdiction to hear and adjudicate the claim. *Terry*, 17 N.E.3d at 393; *see also B.R. ex rel. Todd*, 1 N.E.3d at 713 ("Simply said, the Act grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court.").

[14] We further observe that "'the statutory procedures for bringing a medical malpractice action are in derogation of common law, and as such, they are to be strictly construed against limiting a claimant's right to bring suit.'" *B.R. ex rel. Todd*, 1 N.E.3d at 713 (quoting *Weldon v. Universal Reagents, Inc.*, 714 N.E.2d 1104, 1107 (Ind. Ct. App. 1999)). When our General Assembly enacts a statute in derogation of common law, we presume that the legislature is aware of the common law and does not intend to make any change beyond what is declared in express terms or by unmistakable implication. *Id.*

[15]     As explained in *B.R. ex rel. Todd*,

> "Malpractice" is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." I.C. § 34-18-2-18. A "patient" is "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." I.C. § 34-18-2-22. And "health care" is "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." I.C. § 34-18-2-13.

*Id.*

[16]     "The Act covers 'curative or salutary conduct of a health care provider acting within his or her professional capacity, but not conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" *Terry*, 17 N.E.3d at 393 (quoting *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011)). Indiana Code section 34-18-2-14 defines a "health care provider" in pertinent part as:

> An individual, a partnership, a limited liability company, a corporation, a professional corporation, a facility, or an institution licensed or legally authorized by this state to provide health care or professional services as a physician, psychiatric hospital, hospital, health facility, emergency ambulance service [], dentist, registered or licensed practical nurse, physician assistant, certified nurse midwife, anesthesiologist assistant, optometrist, podiatrist, chiropractor, physical therapist,

respiratory care practitioner, occupational therapist, psychologist, paramedic, advanced emergency medical technician, or emergency medical technician, or a person who is an officer, employee, or agent of the individual, partnership, corporation, professional corporation, facility, or institution acting in the course and scope of the person's employment.

*\*\**

A corporation, limited liability company, partnership, or professional corporation not otherwise qualified under this section that:

> (A) as one (1) of its functions, provides health care;
>
> (B) is organized or registered under state law; and
>
> (C) is determined to be eligible for coverage as a health care provider under this article for its health care function.

Coverage for a health care provider qualified under this subdivision is limited to its health care functions and does not extend to other causes of action.

The parties agree that Kafatia was an employee of Oaklawn, a "health care provider," and when the incident occurred, Kafatia was acting within the scope of his employment.

[17] When deciding whether a claim falls under the provisions of the Medical Malpractice Act, we are guided by the substance of a claim to determine the applicability of the Act. *Terry,* 17 N.E.3d at 393. The fact that the alleged misconduct occurred in a healthcare facility, or that the injured party was a patient at the facility, has not been dispositive in determining whether the claim

sounds in medical malpractice. *Id.* (citing *Madison Ctr., Inc. v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006), *trans. denied*). Instead, we consider whether the claim is based on the provider's behavior or practices while acting in his professional capacity as a provider of medical services. *Id.* Or, put differently, "[a] case sounds in ordinary negligence where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community." *Anonymous Hosp., Inc. v. Doe,* 996 N.E.2d 329, 333 (Ind. Ct. App. 2013), *trans. denied.* Thus, we have held that the Act was not intended to extend to cases of ordinary negligence or premises liability. *Pluard ex rel. Pluard v. Patients Comp. Fund*, 705 N.E.2d 1035, 1037 (Ind. Ct. App. 1999), *trans. denied*.

[18] Application of these tests has resulted in "'hairline distinctions between claims that sound in medical negligence and those that sound in ordinary negligence.'" *Preferred Prof'l Ins. Co. v. West*, 23 N.E.3d 716, 727 (Ind. Ct. App. 2014), *trans. denied* (quoting *Doe*, 996 N.E.2d at 333). More recent decisions of this court have offered the following distinction when facing the issue of whether a claim falls within the purview of the Act:

> A case sounds in ordinary negligence [rather than medical negligence] where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community. By contrast, a claim falls under the Medical Malpractice Act where there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship.

*West*, 23 N.E.3d at 727 (quoting *Terry*, 17 N.E.3d at 393) (brackets in original); *accord B.R. ex rel. Todd*, 1 N.E.3d at 714–15.

[19] Since these cases, however, our supreme court has handed down its decision in *Cox v. Evansville Police Department, et al.*, 107 N.E.3d 453 (Ind. 2018). In *Cox* and *Babi Beyer v. City of Fort Wayne*, which were consolidated on appeal, the court was faced with illegal and sexually abusive conduct by two on duty police officers in uniform, each of whom raped a woman who was in the respective officer's custody. Both officers' employers claimed that the horrid conduct in question was far outside the scope of the officers' respective employment as law enforcement officers and thereby outside the scope of the doctrine of *respondeat superior*, under which the employer can be held liable for an employee's actions.

[20] Our supreme court disagreed. The court observed that "the scope of employment encompasses the activities that the employer delegates to employees or authorizes employees to do, plus employees' acts that naturally or predictably arise from those activities." *Id*. at 461. Moreover, the scope of employment may include unauthorized acts, forbidden acts, acts that violate an employer's instructions, acts that breach the employee's professional duty, or acts that are malicious or criminal. *Id*.

> The scope of employment extends beyond [an employer's] authorized acts for two key reasons. First, it is equitable to hold people responsible for some harms arising from activities that benefit them. When employees carry out assigned duties, those employment activities "further the employer's business" to an appreciable extent, benefiting the employer. But delegating

employment activities also carries an inherent risk that those activities will naturally or predictably give rise to injurious conduct. When that happens, the employer is justly held accountable since the risk accompanies the employer's benefit.

Second, holding employers liable for those injurious acts helps prevent recurrence. Employers can take measures—like selecting employees carefully and instituting procedures that lessen employment dangers—to reduce the likelihood of tortious conduct. Since employers have some control over the risk of injurious conduct flowing from employment activities, imposing liability on employers for that conduct encourages them to take preventive action.

To be clear, the focus in determining the scope of employment "must be on how the employment relates to the context in which the commission of the wrongful act arose." When tortious acts are so closely associated with the employment that they arise naturally or predictably from the activities an employee was hired or authorized to do, they are within the scope of employment, making the employer liable. But tortious acts are not within the scope of employment when they flow from a course of conduct that is independent of activities that serve the employer.

*Id*. at 461–63 (internal citations omitted). Ultimately, the court concluded that criminal conduct that violates an employee's official duties or his or her employer's express orders may nevertheless be within the scope of employment if "the tortious act arose naturally or predictably from the employment context." *Id*. at 463–64.

Considering the nuances of all of the Indiana cases in this area together with our supreme court's recent direction in *Cox*, we believe that the current test under Trial Rule 12(B)(1) as to whether the Medical Malpractice Act applies to specific misconduct is to determine whether that misconduct arises naturally or predictably from the relationship between the health care provider and patient or from an opportunity provided by that relationship. It is further important to realize that, under *Cox*, such conduct may include otherwise tortious or abusive conduct.

If this standard is not met, or if the misconduct is a pure question of premises liability, then standard negligence law applies. We now apply this test to the facts and circumstances of this case.

### I. The Estate's Arguments

The Estate argues that the trial court erred when it granted Oaklawn's motion to dismiss for two reasons. "[F]irst, kicking Martinez was unrelated to the promotion of his health or medical wellbeing, and second, any tangential connection to enforcing quiet hours does not require any medical judgment, skill, or expertise." Appellant's Br. at 13. Further, the Estate argues that its "allegations amount to Oaklawn's failure as the premises owner of Metcalf House to provide its business invitees (residents and guests) with a reasonably safe environment." *Id*. at 17. Finally, the Estate emphasizes that Martinez was voluntarily housed at the facility and objects to Oaklawn's characterization that Martinez was confined to Metcalf House. Reply Br. at 5.

[24] The Estate cites *B.R. ex rel. Todd v. State* in support of its argument that its claims sound in negligence because the "actions of Oaklawn and its employee did not require a healthcare professional to use their expertise, skill, or judgment." Appellant's Br. at 15. In that case, a three-year-old child, who was placed in therapeutic foster care, ran from the therapeutic foster parents' home to an adjacent property where a swimming pool was located. The child nearly drowned in the pool and suffered catastrophic brain damage as a result. *B.R. ex rel. Todd*, 1 N.E.3d at 711.

[25] B.R., by his next friend, filed a complaint against the mental health center that had contracted with DCS to facilitate therapeutic foster care placements. The trial court granted the health center's motion to dismiss the complaint under Trial Rule 12(B)(1) after concluding that the claims fell under the Medical Malpractice Act. *Id.* at 712.

[26] On appeal, B.R. claimed that the health center's decision concerning placement with and dissemination of information about his specific needs to his therapeutic foster parents fell under the practice of foster care management, and not health care. *Id.* at 715. B.R. argued that because a health care professional was not required to participate in his placement with his therapeutic foster parents, the health center's professional services did not constitute health care. *Id.* We agreed and noted that therapeutic foster care placements are often made by individuals with no health care training.

[27]     We also agreed that a medical review panel "is no more equipped to consider" the health center's negligence than the average juror. *Id*. at 716. Our court discussed the General Assembly's purpose for requiring medical malpractice claims to be reviewed by a medical review panel:

> The text of the Act itself thus leads one to conclude that the General Assembly intended to exclude from the legislation's purview conduct of a provider unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill or judgment.

> * * *

> The legislature's establishment of a medical review panel, the sole purpose of which is to provide an expert determination on the question of whether a provider complied with the appropriate standard of care, suggests that the scope of the Act is likewise confined to actions premised upon the exercise of profession[al] judgment.

*Id*. (quoting *Collins v. Thakkar*, 552 N.E.2d 507, 510–11 (Ind. Ct. App. 1990), *trans. denied*). We concluded that the case manager's alleged negligence was unquestionably within the understanding of the average lay juror. *Id*. And "[a] medical professional is no better equipped than the average juror to consider whether the case manager complied with the appropriate standard of care." *Id*. Therefore, we held that B.R.'s claims sounded in general negligence, and the trial court erred when it granted the health center's motion to dismiss. *Id*. at 717.

[28] The Estate also directs our attention to *OB-GYN Associates of Northern Indiana, P.C. v. Ransbottom*, 885 N.E.2d 734 (Ind. Ct. App. 2008), *trans. denied*. In that case, we concluded that cosmetic laser hair removal was not health care because "physicians were not involved in Ransbottom's treatment, and the operator of the laser machine was not required to be a healthcare worker or possess healthcare credentials such as medical degrees, medical licensure, or medical certification in order to operate the machine." *Id.* at 739. We also stated:

> [T]his treatment can be, and often is, legally administered in beauty salons by beauty salon employees. With this in mind, it appears that, but for the fact that the laser machine's operator happened to be a registered nurse and the laser machine happened to be located in a medical facility, there would be no question but that Ransbottom's laser hair removal treatment did not constitute health care. Again, so far as we can tell, Ransbottom could have legally obtained the same treatment somewhere other than a healthcare facility, and could have legally done so without the assistance or participation of someone with valid healthcare licensing or certification credentials. In those respects, the laser hair removal treatment is analogous to tattooing or tanning, both of which alter the body for cosmetic purposes, but neither of which need be performed by a licensed or certified physician or healthcare professional.

*Id.*

[29] In support of this conclusion, we emphasized the fact that "no healthcare professional was required to" participate in the laser hair removal treatment. *Id.* at 740. *See also Community Hosp. v. Avant*, 790 N.E.2d 585, 587 (Ind. Ct. App.

2003) (holding that although the plaintiff was involved in a fitness program at a facility owned by the hospital with a trainer employed by the hospital, the plaintiff was not a "patient" as that term is used in the Medical Malpractice Act because he was not under a physician's orders to start the program as part of a medical treatment plan).

[30]     The Estate also relies on *Doe by Roe v. Madison Center Hospital*, 652 N.E.2d 101 (Ind. Ct. App. 1995). In that case, a minor child, who was a patient of a psychiatric center, was sexually assaulted and molested by a mental health counselor/orderly. The trial court dismissed the child's intentional tort claims for lack of subject matter jurisdiction, and our court reversed after concluding that the claims did not fall within the purview of the Act. Specifically, our court concluded:

> Doe's allegations, that [employee] King coerced Jane Doe, a minor, to engage in sexual intercourse causing her to contract a venereal disease, do not constitute a rendition of health care or professional services. The alleged acts, although occurring during Jane Doe's confinement in the Hospital for psychiatric care and treatment, were not designed to promote her health. Neither do they call into question King's use of skill or expertise as a health care provider.

*Id*. at 104 (internal citation omitted). Furthermore, our court observed that the child and the counselor did not have a therapist-patient relationship.

[31]     Relying on those cases, the Estate argues that Kafatia is not a licensed healthcare professional but simply a "resident assistant," and no professional

expertise, skill, or judgment was involved in Kafatia's enforcement of Metcalf House's curfew rule. Appellant's Br. at 16. According to Kafatia's supervisor there was "only so much you can do" when someone refuses to go to bed. Appellant's Conf. App. pp. 87–88. And in that situation, a resident assistant is supposed to prompt the resident to go to bed and remind them of the rules. If that is ineffective, the resident assistant is supposed to refer the situation to his or her supervisor. *Id.* For these reasons, the Estate argues that Oaklawn's liability arises not under the Medical Malpractice Act, but from "its duty to exercise reasonable care for the safety of its invitees under a premises liability theory" as set forth in its complaint. Appellant's Br. at 17.

## II. *Oaklawn's Response*

[32] Oaklawn contends that the Estate's complaint sounds in medical malpractice because Martinez's "injury occurred while an employee of a psychiatric group home was acting within the scope and course of his employment in enforcing the rules of the psychiatric facility." Appellee's Br. at 10. Further, the Oaklawn employee's actions necessary to enforce the terms and conditions of a resident patient's confinement in the facility required medical knowledge. Therefore, the Estate's claims fall under the Act.

[33] Oaklawn relies on *Putnam County Hospital v. Sells*, 619 N.E.2d 968 (Ind. Ct. App. 1993). In that case, Sells, while under the effects of anesthesia administered during a tonsillectomy, fell from the bed in her recovery room because the bed railings were not in the upright position. On appeal, our court concluded that Sells's complaint raised a claim for medical malpractice.

[34] Importantly, Sells alleged that the hospital was "negligent in failing to properly train and supervise its staff members with regard to the proper procedure for monitoring patients in the recovery room following surgery." *Id.* at 971 (record citation omitted). Sells also alleged that the hospital was negligent by failing to properly monitor her in the recovery room, failing to ensure she did not injure herself while under anesthesia, and failing to ensure that the railings were in place on her recovery room bed. *Id.* We observed that the allegations in the case did not involve faulty premises or equipment. Rather, Sells alleged that the hospital made negligent health care decisions while she was under general anesthesia recovering from a surgical procedure. *Id.* For these reasons, we concluded that Sells's complaint fell "squarely within the scope of the Act." *Id.*

[35] Oaklawn argues that like *Sells*, the Estate has alleged that Oaklawn negligently supervised Martinez and Kafatia, and that Oaklawn "failed to provide the proper training and monitoring of its staff during Mr. Martinez's confinement in Metcalf House." Appellee's Br. at 16. Oaklawn observes that as a resident assistant, Kafatia was trained to assist Martinez "with his treatment plan for skill training to lead Mr. Martinez to be ready to move out of the psychiatric group home and into his own apartment." *Id.*; *see also id.* at 17 (arguing that Kafatia "was attempting to provide care" for Martinez because he was "promoting structure and regularity for a mentally ill patient in a salutary environment").

### III. Cases Involving a Third Party are Distinguishable from Cases Falling Under the Act

[36] The parties rely on the following cases, which are easily distinguishable from this case because they involve injuries directly caused by third parties. They are briefly discussed below. We consider them because they have been cited by one or both of the parties.

[37] Oaklawn argues that the facts of this case are analogous to *Ogle v. St. John's Hickey Memorial Hosp.*, 473 N.E.2d 1055 (Ind. Ct. App. 1985), *trans. denied*. In that case, Ogle, a patient committed to the psychiatric ward of the hospital, was raped by another patient during her commitment. Ogle sued the hospital and alleged that it failed to provide proper security and failed to protect her. The trial court dismissed Ogle's complaint on the hospital's motion because she failed to file a proposed complaint with the medical review panel.

[38] Our court affirmed the trial court after concluding that Ogle's claims fit the definition of health care. Specifically,

> [s]he alleges an act (the providing of protection), which should have been performed ("negligently failed to provide...."), by a health care provider (St. John's), for a patient (Ogle), during the patient's confinement (Ogle's confinement in the psychiatric ward because of her suicidal tendency). *The providing or not providing of suitable confinement for such a patient can hardly be classed as anything other than a professional judgment based on medical knowledge under the terms of the Act as written.* This is true even though the harm experienced was not another attempt at self-destruction. Proper limitations on exposure of a mentally ill patient to the public or to other patients is necessarily a medical

judgment. The legislature expressly recognized that proper confinement is an act of medical care as it drafted the Health Care Definition section to encompass acts occurring during "the patient's medical care, treatment or confinement."

*Id.* at 1058–59 (emphasis added). The emphasized language supports Oaklawn's arguments in this case. However, the facts of the *Ogle* case are distinguishable from those in this appeal because they involve the actions of a third-party.

[39]     In *Madison Center, Inc. v. R.R.K., et al.*, 853 N.E.2d 1286 (Ind. Ct. App. 2006), *trans. denied,* R.R.K, a seventeen-year-old inpatient resident of Madison Center, a psychiatric hospital, was being disciplined for his behavior. Another inpatient resident was standing nearby and refused to leave. When R.R.K. and the other resident began arguing, hospital staff restrained R.R.K., but not the other resident. The resident then ran up to R.R.K. and kicked him in the face causing significant injury. Once again, R,R.K.'s injuries were proximately caused by a third party.

[40]     Our court agreed with the trial court that R.R.K.'s complaint alleged a premises liability claim not governed by the Medical Malpractice Act. We observed that

> R.R.K.'s injuries were not caused by any services which the Center as the health care provider provided or failed to provide to him as a patient. Rather, they were caused by another resident whom the Center failed to medicate, restrain, or confine. As such, they arise not from the Center's medical treatment of R.R.K., but from his presence on the Center's premises. Indeed, a visitor upon the premises could have as easily sustained R.R.K.'s injuries.

*Id.* at 1288.

[41] Furthermore, we observed that "the Center's failure to properly medicate, restrain, or confine the resident who struck and injured R.R.K. may have constituted malpractice as to that resident, but not to third parties with whom the resident may have come into contact." *Id.* at 1289. "The duty the Center owed to R.R.K. to prevent his being subject to attack by one of the other patients was the same as the duty owed to any invitee upon the premises. It did not arise from R.R.K.'s medical treatment, but from his presence on the premises." *Id.*

[42] In so concluding, another panel of our court relied on our supreme court's opinion in *Webb v. Jarvis*, 575 N.E.2d 992, (Ind. 1991),[3] which also involved an assault by a third party that the court concluded sounded in negligence. The *R.R.K.* panel also explicitly disagreed with this court's earlier *Ogle* decision, which we noted was also decided before our supreme court decided *Webb*. *R.R.K.*, 852 N.E.2d at 1289.

## Conclusion

[43] The undisputed record establishes that Oaklawn is a healthcare provider and Kafatia is, and was at the time of the incident at issue in this case, its employee.

---

[3] In *Webb*, the plaintiff, who was a shooting victim, sued the physician who prescribed anabolic steroids for the third-party contending that, by doing so, the physician committed malpractice. 575 N.E.2d at 992, *disapproved by Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 391 (Ind. 2016).

Martinez was, whether voluntarily or otherwise, Oaklawn's patient in Metcalf House. In that setting, Kafatia's attempt to enforce Martinez's curfew was a part of Oaklawn's provision of healthcare to Martinez. When the altercation occurred that injured Martinez, Kafatia was naturally responding to Martinez's physically aggressive behavior by defending himself. Kafatia thereafter followed Oaklawn's protocol by removing himself from Martinez's immediate physical presence and waiting for law enforcement to assist with Martinez. These facts and circumstances, together with the broadened scope of employment set forth in *Cox*, place the incident and injuries squarely within the scope of the Medical Malpractice Act.

[44] We therefore affirm the trial court in all respects.

Robb, J., and Altice, J., concur.